# ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------X

IN RE: AIR CRASH AT BELLE HARBOR,
NEW YORK ON NOVEMBER 12, 2001

----------------------------------------X

DOC # 288

-- 97701

02 MDL 1448 (RWS)
02 Civ. 439 (RWS) —#168

This Document
Relates to:
PASSENGER CASES

O P I N I O N

FILE UNDER SEAL

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10|10|08

MICROFILMED

JUL - 2 2009 -3 PM

**Sweet, D.J.,**

Defendant Airbus S.A.S. ("Airbus" or the "Defendant") has moved under Rule 56, Fed. R. Civ. P. for partial summary judgment dismissing the punitive damage claims of the passenger plaintiffs (the "Plaintiffs"). Upon the facts and conclusions set forth below, the motion is granted.

## Prior Proceedings

American Airlines Flight 587 crashed shortly after takeoff from J.F.K. International Airport on November 12, 2001. The crash resulted in the deaths of all 251 passengers and 9 crew on Flight 587. The crash also resulted in the deaths of 5 persons on the ground and caused various property damage and injuries to persons on the ground.

The families and estates of the passengers on Flight 587 filed lawsuits against Airbus and American Airlines, Inc. and AMR Corporation (collectively, "AAL") in the fall of 2001 and thereafter. With respect to Airbus, the Plaintiffs have alleged that it is liable for negligence and strict products liability; Plaintiffs specifically complain that the subject aircraft's -- the Airbus A300B4-605R ("AAL A300") -- flight

1

control system, airframe, vertical stabilizer, rudder, and manuals were defective, unreasonably dangerous, and unfit for their intended use. One of the plaintiffs makes the following representative allegations against Airbus:

> [T]he subject aircraft and its component parts and systems, including but not limited to, the subject aircraft's flight control system, flight instrumentation system, airframe, vertical stabilizer, were defective, unreasonably dangerous, unsafe and unfit for its intended use, and incompatible with reasonable expectations for the performance of said product, and said defects could and did cause the subject aircraft to crash.

Priscia Celestino First Am. Complaint ("Compl.") ¶ 25 (Case No. 02-1310); see also Landsman Compl. ¶ 65 (Case No. 02-6590) ("the SUBJECT AIRCRAFT was defective and unreasonably dangerous and unsafe by reason of defendant AIRBUS's defective design, manufacture, assembly, inspection, testing, distribution, sale, warnings and instructions, service, maintenance and/or repair of the SUBJECT AIRCRAFT and its component parts and systems"). Reiterating the allegations of their complaints, the Plaintiffs also alleged that Airbus's conduct was wanton and willful and that they are therefore entitled to punitive damages. See, e.g., Priscia Celestino First Am. Compl. ¶ 33 ("The crash of the subject aircraft and the resultant injuries and death to the decedent were caused by the wanton and willful misconduct of

defendants American and Airbus Industrie, and each of them, including their officers, agents, servants and/or employers as set forth herein, whose actions and omissions were outrageous and gross and said defendants acted with reckless disregard for the safety of the Plaintiff's decedent."); Landsman Compl. ¶ 77 (same).

On May 9, 2006, in response to motions by the parties, an opinion was filed with respect to the choice of law issues in this case, including the law applicable to the Plaintiffs' request for punitive damages based on alleged misconduct in the design and assembly of the AAL A300. See In re Air Crash at Belle Harbor, New York on November 12, 2001, No. MDL 1448 (RWS), 2006 WL 1288298, at *26 (S.D.N.Y. May 9, 2006) ("The May 9 Opinion"). The May 9 Opinion stated that "the most important factors in determining the applicable law for punitive damages are the place of the relevant conduct and the defendant's place of business," but that the choice of law applicable to the punitive damages claims "depends upon a factual determination: namely, the place of the design and manufacture of the product," and concluded that "[a] decision as to whether or not the law of France is applicable to punitive damages must await an appropriate factual record." Id. at *26.

3

Fact discovery has now been completed and the instant

Airbus motion was marked fully submitted on February 27, 2008.

**The Facts**

The facts have been set forth in the Airbus Statement

of Material Facts Not in Genuine Dispute (the "Airbus

Statement") and the Plaintiffs' Local Rule 56.1 Statement of

Material Facts in support of Plaintiffs' Opposition to

Defendants' Motion for Partial Summary Judgment ("Plaintiffs'

Statement in Opposition"). The facts set forth below are not in

dispute.

Airbus is organized under French law as a simplified

joint stock company, or Societe par Actions Simplifiee ("S.A.S")

and since 1974, Airbus has maintained its worldwide headquarters

in Toulouse, France.

Airbus makes all final decisions pertaining to the

design, assembly, certifications, distribution, and marketing of

all Airbus aircraft including the AAL A300, in France, and the

largest proportion of Airbus employees work in France and

Germany. Since 2006, Airbus has been owned through holding

companies by a Dutch company, the European Aeronautic Defense

and Space Company ("EADS"). EADS is not involved in Airbus's day-to-day operations and does not make final decisions concerning the design, assembly, certification, or marketing of Airbus aircraft. Between 2001 and 2006, EADS held an 80% stake in Airbus and the remaining 20% of Airbus was owned by BAE Systems, a British Company.

Before 2001, Airbus operated as a Groupement d'Interet Economique ("GIE") and was owned by several manufacturers and its successors in interest, including Aerospatiale (French), Deutsche Airbus (German), British Aerospace (British), and CASA (Spanish).

Throughout the changes in Airbus's ownership structure, its principal place of business has remained in France.

Airbus currently operates small customer service centers in a number of countries which are responsible for transmitting queries from customers to Airbus headquarters for resolution and operates "Centres of Excellence," which only recently opened and which did not exist at the time that Airbus designed, assembled, certified, and marketed the AAL A300. Airbus's Centres of Excellence provide assistance in the design

5

process to Airbus personnel in France. An Airbus subsidiary, Airbus Americas, operates in North America and, since late 2007, South America. Previously known as Airbus North America, the Airbus Americas headquarters is located in Herndon, Virginia. An Airbus Americas' subsidiary, Airbus Services Company, operates a training center in the United States which implements training programs developed by Airbus personnel working at Airbus's headquarters in Toulouse, France. An Airbus subsidiary, Aeroformation, trained fewer than twenty (20) AAL pilots to operate the AAL A300 in Toulouse, France.

Neither Airbus nor any Airbus affiliate provided training to any AAL A300 pilots in Miami, Florida or anywhere else in the United States. Neither Airbus nor any Airbus affiliated company provided any flight crew training directly to Sten Molin or Edward States.

The A300B2/B4 widebody jet was the first aircraft designed and manufactured by Airbus. The A300B2/B4 aircraft first flew in 1972 and Airbus delivered the first A300 aircraft, an A300B2/B4, into the stream of commerce in 1974. Airbus has produced a number of variants of the A300B2/B4 aircraft, including the A300-600, which entered service in 1984; the

A300B4-605R or AAL A300, which entered service in 1988; and the A300F4-605R or FedEx A300, which entered service in 1994.

Airbus designed every A300 variant, including the AAL A300 and FedEx A300, at its headquarters in Toulouse, France. Airbus-affiliates companies in Germany performed some of the initial design work on individual components of the AAL A300, subject to the oversight of Airbus in France which remained responsible for final design decisions.

Airbus designed the vertical stabilizer and rudder in Germany according to initial specifications furnished by Airbus in France which also gave final design approval and exercised continuing oversight over the design process. With respect to the rudder control system, including the yaw damper, Airbus prepared the AAL A300 designs in France, either on its own or in conjunction with a third-party contractor working pursuant to Airbus-supplied specifications. Airbus did not design any parts on the AAL A300 or any other A300 variant in the United States.

Airbus assembled the entire fleet of A300 aircraft, including the AAL A300 and the FedEx A330, at its headquarters in Toulouse, France. Airbus-affiliated companies outside of France assembled some AAL A300 parts and then sent them to

France for final assembly. Airbus assembled the AAL A300's vertical stabilizer and rudder in Germany subject to oversight by Airbus personnel in France. Airbus did not assemble any parts on the AAL A300 in the United States.

Airbus tests and inspects every aircraft, including the AAL A300, before delivery to Airbus customers. Airbus conducts, inspects and tests its aircraft to ensure that they satisfy internal and external specifications. Airbus conducts inspections and tests on all Airbus aircraft, including the AAL A300, in France.

On March 10, 1988, the Direction Generale de l'Aviation Civile ("DGAC"), the French equivalent of the Federal Aviation Administration ("FAA") issued a type certificate for the AAL A300. (DGAC Type Certificate Data Sheet No. 145 at 1). On March 28, 1988, FAA issued a type certificate for the AAL A300 for flight in the United States. (FAA Type Certificate Data Sheet No. A35EU at 35). Because FAA certified the AAL A300 on the basis of a bilateral airworthiness agreement between the United States and France it did not conduct independent tests or examinations on the AAL A300. Several FAA personnel came to France to observe and review tests conducted by DGAC on the AAL A300, including flight tests.

On February 15, 1994, DGAC issued a type certificate for the FedEx A300. (DGAC Type Certificate Data Sheet No. 145 at 1). On April 27, 1994, FAA issued a type certificate for the FedEx A300. (FAA Type Certificate Data Sheet No. A35EU at 36-42). FAA Issued a type certificate for the FedEx A300 for flight in the United States pursuant to the bilateral airworthiness agreement between the United States and France. FAA did not conduct independent examinations or tests on the FedEx A300 in connection with its certification in the United States and instead relied upon the tests and examinations carried out by DGAC.

All communications between Airbus and FAA concerning certification of the AAL A300 and FedEx A300 occurred among persons based in France, Belgium, and the State of Washington. Airbus prepared all of the manuals and other related documents for the AAL A300 in France. Airbus employees in France monitored the AAL A300's performance and decided whether to revise the AAL A300's manuals or to issue warnings to customers regarding aircraft operations.

Airbus and AAL entered into the agreement for the purchase of the AAL A300 aircraft in France. On March 2, 1987,

9

AAL agreed to purchase thirty-five (35) Airbus AAL A300 aircraft from AVSA, S.A.R.L., a sales subsidiary of Airbus which was based in Dublin, Ireland. (Airbus A300-600 Acquisition Agreement at 1-2-2 (Mar. 2, 1987).

Airbus delivered the AAL A300 aircraft operated as AAL Flight 587 (MSN 420) to AAL in France on July 12, 1988. At the time that it designed and assembled the AAL A300, Airbus's only presence in the United States consisted of a sales office in Herndon, Virginia operated by Airbus Industrie North America, Inc., an independent subsidiary that is not and has never been a party to this litigation.

The Plaintiffs' complaints allege that the design of the rudder system and the vertical stabilizer on the aircraft that crashed in Belle Harbor on November 12, 2001 involved the willful and reckless conduct of Airbus personnel, which contributed directly to the November 12, 2001 crash and that Airbus knowingly permitted its American Airlines A300 and FedEx A300 aircraft to be certified as airworthy for flight in the United States.

## The Summary Judgment Standard

Summary judgment is granted only if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); SCS Communs., Inc. v. Herrick Co., 360 F.3d 329, 338 (2d Cir. 2004); see generally 11 James Wm. Moore, et al., Moore's Federal Practice P 56.11 (3d ed. 1997 & Supp. 2004). The court will not try issues of fact on a motion for summary judgment, but, rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986). Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223-24 (2d Cir. 1994) (internal citations omitted). "The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that the undisputed

facts establish her right to judgment as a matter of law." Rodriguez v. City of New York, 72 F.3d 1051, 1060-61 (2d Cir. 1995).

A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; see also R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 57 (2d Cir. 1997). Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; see also Quarles v. Gen. Motors Corp., 758 F.2d 839, 840 (2d Cir. 1985) ("[T]he mere existence of factual issues -- where those issues are not material to the claims before the court -- will not suffice to defeat a motion for summary judgment.").

In determining whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Gibbs-Alfano v. Burton, 281 F.3d 12, 18 (2d Cir. 2002). Thus, "[s]ummary judgment may be granted if, upon reviewing the

12

evidence in the light most favorable to the nonmovant, the court determines that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." Richardson v. Selsky, 5 F.3d 616, 621 (2d Cir. 1993).

Here, the Airbus Statement and the Plaintiffs' Statement in Opposition establish that the material facts as set forth above with respect to the design, assembly, testing, and operation manuals of the Airbus A300 are not in dispute.

## French Law Applies

The May 9 Opinion determined that the passengers' compensatory damages claims against Airbus and AAL fall within the Court's admiralty law jurisdiction and that substantive admiralty law, not New York law, governs the wrongful death claims relating to those cases. See May 9 Opinion, 2006 WL 1288298, at *13. The May 9 Opinion also concluded that maritime law does not preclude the application of an award of punitive damages. See id. at *21-23.

As to the Plaintiffs, the May 9 Opinion stated that "[c]onflict-of-law issues should be decided under an issue-specific approach, called depecage, which 'recognizes that in a

13

single action different states may have different degrees of interests with respect to different operative facts and elements of a claim or defense.'" Id. at *23 (quoting Simon v. Phillip Morris, Inc., 124 F. Supp. 2d 46, 75 (E.D.N.Y. 2000)). "Whereas the place of injury and the domicile of the decedent assumed great importance in determining the applicable law for compensatory damages, the conduct-regulating aspect of punitive damages suggests that the dominant factors should be those that touch on the defendant's actions." Id. at *24.

The May 9 Opinion further stated:

Since the most important factors in determining the applicable law for punitive damages are the place of the relevant conduct and the defendant's place of business, whether the principle of depecage is appropriate in this instance depends upon a factual determination: namely, the place of the conduct to be regulated, the place of the design and manufacture of the product.

Id. at *26.

The submissions by the parties have reinforced these conclusions.

The facts found above establish that the principal place of business of Airbus is in France, and the A300 and its

14

variants were designed in and largely assembled in France, although the rudder and vertical stabilizer were assembled in Germany. The A300 was tested in France and certified there, a certification accepted by the FAA, the manuals relating to the A300 were prepared in France, and the plane was sold and delivered to AAL in France.

The facts as now determined establish that France is "the place of the conduct to be regulated, the place of the design and manufacture of the product." May 9 Opinion, 2006 WL 1288298, at *26. To focus on the place of the relevant conduct is consistent with precedent holding that the choice of law inquiry in aviation accident cases involving punitive damages claims depends primarily on the place of the alleged misconduct. See, e.g., In re Air Crash Disaster at Sioux City, Iowa, 734 F. Supp. 1425, 1435 (N.D. Ill. 1990); Lewis-DeBoer v. Mooney Corp., 728 F. Supp. 642, 645 (D. Colo. 1990); In re Disaster at Detroit Metropolitan Airport, 750 F. Supp. 793, 802 (E.D. Mich. 1989); In re Air Crash Disaster at Stapleton Int'l Airport, 720 F. Supp. 1445, 1453 (D. Colo. 1988).

Where, as here, the Plaintiffs allege that punitive damages are warranted because of misconduct in the design and manufacture of an aircraft that occurred almost entirely in

15

France by a company that is located in France, French law applies. See In re Aircrash Disaster Near Roselawn, Indiana on Oct. 31, 1994, No. 95 C. 4593, 1997 WL 572897, at *4 (N.D. Ill. Sept. 9, 1997) (French law applies to punitive damages claims because manufacturers maintain their "principal place of business in France" and "the alleged misconduct relating to the design, testing, and manufacture of the . . . airplane occurred in France").

The Plaintiffs have previously argued that Airbus is owned through holding companies by a Dutch company, EADS, subject to Dutch law; had been owned jointly by EADS and BAE Systems; and has a "'substantial presence in six countries besides France, including three places in the United States.'" May 9 Opinion, 2006 WL 1288298, at *26 (quoting Opposing Brief in Ground Victim Cases at 4).

However, EADS did not own Airbus at the time of the alleged misconduct and does not make final decisions concerning aircraft design, assembly, certification, and marketing. While a multi-national consortium owned Airbus, Airbus was still based in France and made final decisions concerning aircraft design and assembly, in France. Here, the place of Airbus's shareholder's incorporation is irrelevant to the choice of law

analysis where the principal place of business is also the place where virtually all of the relevant conduct occurred. See Cruz v. Ford Motor Company, 435 F. Supp. 2d 701, 707 n.4 (W.D. Tenn. 2006) (noting that place of incorporation is not a significant contact); Kelly v. Ford Motor Co., 933 F. Supp. 465, 469 (E.D. Pa. 1996) (punitive damages choice of law inquiry and placing more weight on place of company's principal place of business rather than place of incorporation).

A connection between Airbus's presence outside of France and the relevant conduct has not been established.

As found above, most of Airbus's presence outside of France is recent and did not exist when Airbus designed, assembled, sold, and delivered the AAL A300. At the time that it designed and assembled the AAL A300, the only Airbus presence in the United States was a sales office in Herndon, Virginia operated by Airbus Industrie North America, Inc., an independent subsidiary that is not a party to this litigation.

The Cruz plaintiffs sought punitive damages in connection with alleged defects in the design, manufacture, construction, and assembly of a sport utility vehicle ("SUV"). On summary judgment, the court found that Ford designed the SUV

17

in Michigan; all corporate decisions involving the "design, manufacture, distribution, and marketing of the [SUV] were made in Michigan," and the Defendant's principal place of business was in Michigan. Cruz, 435 F. Supp. 2d at 702. Not all of the Defendant's conduct occurred in Michigan, however, and the court found that the Defendant was incorporated in Delaware and it manufactured the SUV in Missouri and the allegedly defective door latch in Canada. Id. The court also found that the vehicle involved in the accident had been distributed by the Defendant from a dealership in Tennessee. However, the court held that "Michigan, as the Defendant's principal place of business and the place where the alleged misconduct occurred, has the most significant relationship to the issue of punitive damages," and that Michigan law applied to the punitive damages claims. Id. at 706. The court explained:

> Plaintiffs seek punitive damages with respect to their claims regarding the [SUV's] defective design, manufacture, construction, and assembly, and Defendant's failure to warn of the defective nature of the vehicle. As noted above, the [SUV] was designed in Michigan, and the corporate decisions regarding the design, manufacture, distribution and marketing of the [SUV] were also made in Michigan. While some of the conduct giving rise to Plaintiffs' claims for punitive damages took place in other locations - the [SUV] was manufactured in Missouri and its door latches were manufactured in Ontario, Canada - the Court finds that most of the relevant conduct occurred in Michigan.

Id. at 707.

Even more on point is Roselawn, 1997 WL 572897, where the court applied French law to the plaintiffs' punitive damages claims against aircraft manufacturers for alleged defects in the design, testing, manufacture, and sale of an aircraft. The court found that the manufacturer maintained its "principal place of business in France," "the alleged misconduct relating to the design, testing, and manufacture of the . . . airplane occurred in France," "corporate decisions about that aircraft design and testing, and about what warnings or other information to issue after evaluation of the various [aircraft] 'incidents and accidents' were made in France," and the aircraft's "manuals and product information were created in France and distributed from France." Id. at *4. Nevertheless, the court agreed that the defendants "could be held accountable" for selling the allegedly defective aircraft in Texas, but it did not deviate from its conclusion that French law should apply. Id. Emphasizing that virtually all the facts underlying the plaintiffs' punitive damages claim, "including defective design and manufacture, and other aspects of failure to warn of a defective product, involve[d] misconduct that clearly occurred in France," the court reasoned that the connections were simply too insubstantial to warrant applying Texas law. Id.

19

Both Roselawn and Cruz compel the conclusion that the occurrence of a small portion of relevant conduct in a jurisdiction other than France -- in this case, Germany, where the vertical stabilizer and rudder were designed and assembled -- is not a basis for changing the choice of law analysis as it relates to punitive damages.

Applying the principles set forth in the May 9 Opinion, French law applies to the Plaintiffs' punitive damages claims because Airbus designed, assembled, certified, and delivered the AAL A300 in France, where it also drafted the AAL A300's manuals and decided whether to issue warnings to customers and maintained its principal place of business.

## French Law Does Not Permit Punitive Damages

Unlike many jurisdictions in the United States, including New York, France prohibits punitive damages claims as they are known in the United States. Professor Hans W. Baade, a comparative law expert, has submitted a declaration which states that "[u]nder the French law of torts in effect at times material for present purposes, no punitive damages are available to the victim, irrespective of the degree of fault of the

20

defendant." Declaration of Hans W. Baade ("Baade Decl.") ¶ 35 (Nov. 17, 2005); see also id. ¶ 13-17. Instead of employing punitive damages as a mechanism for punishing and deterring potentially harmful conduct, France has instead "deem[ed] liability for compensatory damages in conjunction with penal liability (where appropriate) to be a sufficient deterrent." Id. ¶ 36.

After finding that French law applied to the plaintiffs' punitive damages claims, the Roselawn court granted summary judgment based on the "undisputed" fact that "punitive damages as they are understood in this country -- damages awarded against a party to punish it for egregious misconduct and to deter future misconduct -- are not permitted under French law." Roselawn, 1997 WL 572897, at *4. A number of other courts have concluded that France does not permit punitive damages. See Arno v. Club Med Inc., 22 F.3d 1464, 1468 (9th Cir. 1994) (noting that French law does not recognize punitive damages); Air Disaster at Lockerbie, Scotland on Dec. 21, 1988, 928 F.2d 1267, 1281 (2d Cir. 1991) ("In fact, under the [French] civil law they [punitive damages] do not appear to be available at all."); Floyd v. Eastern Airlines, Inc., 872 F.2d 1462, 1486 (11th Cir. 1989); In re Air Crash off Long Island, New York, on July 17, 1996, 65 F. Supp. 2d 207, 216 (S.D.N.Y. 1999).

21

The only other jurisdiction with connections to the relevant alleged misconduct in this case is Germany, where Airbus-affiliated companies designed and assembled portions of the AAL A300. Like France, Germany does not permit awards of punitive damages. See, e.g., Minebea Co., Ltd. v. Papst, 377 F. Supp. 2d 34, 41 n.7 (D.D.C. 2005) (noting that German law does not allow punitive damages claims). Dr. Andreas Nelle, a tenured adjunct professor of law at Humboldt University, has established that German law does not authorize punitive damages. See Declaration of Andreas Nelle ¶¶ 2-5, 13. The German equivalent of the United States Supreme Court has "clearly stated that punitive damages are not part of the German civil law system of sanctions." Id. ¶ 12. While German law permits individuals to obtain compensatory damages in connection with tort and products liability claims, "punitive damages are not available to a claimant in Germany, irrespective of the degree of the defendant's fault." Id. ¶ 11. Thus, even if contacts between the "relevant conduct" and Germany warranted application of German law over French law, there would still be no basis for permitting plaintiffs to obtain punitive damages from Airbus.

According to the Plaintiffs, the location of the accident was fortuitous, and the choice of law question must be

22

determined based on the jurisdiction in which the last event necessary to make the defendant liable occurred and should be governed by the same legal standard as the ground plaintiffs' claims. However, the Plaintiffs have not established a basis upon which the contrary conclusion reached in the May 9 Opinion should be set aside.

The Plaintiffs have contended that the choice of law inquiry is unnecessary because there is no actual conflict between French law and domestic law on punitive damages, contending that France's 1994 Penal Code "permit[s] tort victims to initiate court proceedings in which monetary fines and other financial penalties may be imposed to punish corporate misconduct." Opp. at 5.

This contention was rejected in the May 9 Opinion, 2006 WL 1288298, at *30. France's 1994 Penal Code, already established at the time of the May 9 Opinion and the others previously cited, permits monetary fines and financial penalties against companies in criminal proceedings, but does not authorize punitive damages awards as they are known in the United States. See Baade Decl. ¶ 35. There are at least three critical differences between French and domestic law: (1) monetary fines and financial penalties imposed under French

23

criminal law are paid to the State, not the plaintiff; (2) France's monetary fines and financial penalties are awarded by professional judges, not juries, and are strictly limited in amount; and (3) French fines and other financial penalties are exclusive of any other fines and financial penalties. See id. ¶¶ 31-33. Plaintiffs have not submitted authorities to distinguish these substantive differences.

Although not challenging the factual contentions set forth in the Airbus Statement, the Plaintiffs nevertheless suggest that domestic law applies to their punitive damages claims because "Airbus's misconduct . . . extended to its lawless application for American airworthiness certificates to which it was not entitled." Opp. at 9. Even if this contention were accepted, Airbus made all final decisions pertaining to the AAL and FedEx A300 aircraft certifications in France. Regardless of whether Airbus engaged in alleged misconduct in the United States, French law would still apply because "most of the relevant conduct occurred in [France]." Cruz, 435 F. Supp. 2d at 707.

The Plaintiffs also contend that it would be "unprecedented" to apply French law to the passengers' punitive damages claims and that "[n]o court has ever applied foreign law

to citizens of the United States who suffered harm in the United States when that foreign law conflicts with United States law." Opp. at 7. However, under similar circumstances, the Roselawn court applied French law to punitive damages claims brought by citizens of the United States who suffered harm in the United States. See Roselawn, 1997 WL 572897, at *4. The Plaintiffs claim that Roselawn did not involve an "actual conflict of laws because both the location of the accident (Indiana) and the place of manufacture (France) did not recognize punitive damages." Opp. at 7. However, the presence of a conflict between French and domestic law on punitive damages was the very reason the Roselawn court engaged in a choice of law analysis. See Roselawn, 1997 WL 572897, at *4. Plaintiffs, moreover, overlook that the Roselawn plaintiffs actually sought the application of Texas law, not Indiana law, because Texas, unlike France, allowed punitive damages. See id.

Furthermore, Courts have precluded punitive damages claims based on the application of the law of another state, a practice that is functionally identical to precluding punitive damages based on the application of the law of another country. See, e.g., Cruz, 435 F. Supp. 2d at 707; Dickerson v. USAir, Inc., No. 96 Civ. 8560 (JFK), 2001 WL 12009, (S.D.N.Y. Jan. 4,

2001); Kelly, 933 F. Supp. 465, 469; Detroit Metro. Airport, 750
F. Supp. 793.

The Plaintiffs also contend that French law should not
apply to their punitive damages claims because the United States
has a greater interest in seeing its conduct-regulating laws
applied. See Opp. at 11. However, an "interest-analysis test"
is not a component of admiralty's choice of law inquiry. See
May 9 Opinion, 2006 WL 1288298, at *16-17 (explaining choice of
law test under Lauritzen v. Larsen, 345 U.S. 571 (1953)).
Further, interests of the United States have been advanced
through the application of domestic law to Plaintiffs'
compensatory damages claims. See May 9 Opinion, 2006 WL
1288298, at *17. With respect to punitive damages, France's
interest in the application of its laws is superior to those of
any other jurisdiction.

The Supreme Court has cautioned against applying
domestic law in admiralty cases in circumstances that involve
contacts with the United States that are as tenuous as Airbus's.
See Lauritzen, 345 U.S. at 582. Such contacts are inherent to
admiralty's success, the Supreme Court reasoned, but "[i]f . . .
courts . . . exploit every such contact to the limit of its
power, it is not difficult to see that a multiplicity of

conflicting and overlapping burdens would blight international carriage by sea." Id. This warning applies equally to the Plaintiffs' suggestion that domestic law should apply to avoid a result that is unfavorable to them. See id.

## Conclusion

Based upon the facts and conclusions set forth above, the Airbus motion for partial summary judgment is granted, and French law will apply to the passenger punitive damage claims, which are hereby dismissed.

It is so ordered.

**New York, N.Y.**
**March /0 , 2008**

ROBERT W. SWEET
U.S.D.J

27